IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN FRED WHITT, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS LLC | ) | **Jury Trial Requested** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

NOW COMES Plaintiff, STEVEN FRED WHITT, by and through his counsel, Lisa Kane of Lisa Kane & Associates, and complaining of Defendant, GENERAL MOTORS LLC, states as follows:

### PRELIMINARY STATEMENT

1. This is an action seeking redress for the violation of rights guaranteed to Plaintiff by the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Plaintiff seeks mandatory injunctive relief and damages to redress Defendant's discriminatory employment practices.

### JURISDICTIONAL STATEMENT

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343(a)(3) and (4) and 28 U.S.C. § 1331 to secure protection and redress deprivation of rights secured by 29 U.S.C. § 621 et seq. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

1

## VENUE

3. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (2).

## PARTIES

4. Plaintiff, STEVEN FRED WHITT, (hereinafter "Plaintiff") is a fifty-eight (58) year old Caucasian male. Plaintiff was born on April 18, 1961.

5. Defendant, GENERAL MOTORS LLC, (hereinafter "Defendant"), is a foreign limited liability company, which has continuously, and does now employ more than fifteen (15) employees, is engaged in an industry that affects commerce and continues to do business in Illinois.

## PROCEDURE

6. Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on July 23, 2019, alleging age discrimination, Charge Number 440-2019-06347.

7. The EEOC issued Plaintiff a Notice of Right to Sue on October 4, 2019. The Notice of Right to Sue entitles Plaintiff to initiate a civil action in the appropriate forum withing ninety (90) days of the receipt of said Notice. Plaintiff initiated this action in the appropriate forum within ninety (90) days.

## COUNT I
## 29 U.S.C. § 621 - ADEA
## AGE DISCRIMINATION

8. Paragraphs one (1) through seven (7) are incorporated by reference as if fully set out herein.

9. Plaintiff, who is fifty-eight (58) years old, began his employment with Defendant in 1984. Plaintiff's most recent position as an employee of Defendant was Senior Zone Manager at

2

Defendant's North Central Regional Office in Naperville, Illinois.

10. At all times material hereto, Plaintiff performed to Defendant's reasonable satisfaction, as evidenced by, without limitation, the longevity of Plaintiff's exemplary thirty-five (35) years of employment, promotions, receipt of bonuses, and favorable performance reviews. Any assertion that Plaintiff was not performing his job to Defendant's satisfaction is pretext for age discrimination.

11. Plaintiff was promoted to Zone Manager in 2002. Throughout his tenure as a Zone Manager, Plaintiff thrived in the role, evident by his receipt of numerous bonuses, consistently positive performance reviews, and ratings of "Exceeds Expectations" in yearly reviews.

12. As a Zone Manager for Defendant based in Georgia, Plaintiff reported directly to Defendant's Regional Manager, Dan Drews, beginning in 2017.

13. In early 2018, during Plaintiff's tenure in Defendant's South Georgia zone, Plaintiff's zone drastically increased its ranking from number twenty (20) to number five (5), as a result of Plaintiff's hard work and dedication.

14. Consequently, as a result of his impeccable work in improving the zone's rank, Plaintiff received a reward of 110% of his variable in pay from Defendant.

15. In November of 2018, Defendant offered a "Variable Separation Plan" for eligible employees with seniority-the majority of whom were older employees over the age of forty (40). Pursuant to the Variable Separation Plan, employees who accepted the plan would receive a severance package and retire at the end of 2018.

16. In early November of 2018, Defendant's Regional Manager, Dan Drews, who was Plaintiff's supervisor, called Plaintiff into this office and presented him with the Variable Separation

Plan.

17. To Plaintiff's complete dismay, Defendant's Regional Manager, Dan Drews, asked Plaintiff if he knew about the program and whether Plaintiff was interested in accepting the Variable Separation Plan ("VSP").

18. Plaintiff firmly responded that he did not have any interest in retiring early, that he did not intend to accept the Variable Separation Plan and wanted to continue working for Defendant.

19. Immediately thereafter, Defendant's Regional Manager advised Plaintiff that "there could be involuntary separations" that would take place in the near future. Plaintiff reiterated that he wanted to continue working, confident that his flawless thirty-five (35) year record supported his decision.

20. Defendant's Regional Manager, Dan Drews, was adamant that, should Plaintiff choose not to accept the Variable Separation Plan, there would be dire consequences for Plaintiff. Defendant's Regional Manager, Dan Drews, threatened Plaintiff that those who did not accept the Variable Separation Plan would risk involuntary separation without a severance package.

21. Subsequent to Plaintiff's decision to continue his employment rather than accept a severance and early retirement package, Defendant commenced a crusade to push out Plaintiff, who was fifty-eight (58) years old at the time, and eradicate Defendant's older workers from the company.

22. In December of 2018, Defendant's Regional Manager, Dan Drews, informed Plaintiff that he was going to conduct a series of interviews for positions opening as a result of older employees accepting the Variable Separation Plan offered by Defendant.

23. Defendant's Regional Manager, Dan Drews, indicated that the candidates had already

been selected, and articulated to Plaintiff, "we just need to get them interviewed so we can say we did it."

24. Defendant's interview process was a facade, as Defendant had predetermined which candidates it intended to hire. In fact, it was common practice for a candidate to be chosen prior to interviews taking place, yet the interviews were conducted for the sake of appearances.

25. Within three weeks of Plaintiff's rejection of the Variable Separation Plan, Defendant notified Plaintiff, who was fifty-eight (58) years old, that he was going to be transferred from Georgia to Defendant's Chicago zone, located in Naperville, Illinois.

26. If Plaintiff failed to accept the transfer to Chicago offered by Defendant's Regional Manager, Dan Drews, Plaintiff would be considered "voluntarily terminated" by Defendant at that time.

27. After announcing to Plaintiff that he was being transferred to Chicago, Plaintiff was informed that he had to interview for the position in Defendant's Chicago zone. Plaintiff was immediately replaced in Defendant's South Georgia zone by Josh Weimer, a substantially younger employee in his early forties (40s).

28. On January 16, 2019, Plaintiff assumed his position at Defendant's Naperville office. At the time Plaintiff commenced his new role in Defendant's Naperville office, he had a full staff of competent, trained and qualified employees.

29. To Plaintiff's complete dismay, Defendant set Plaintiff up for failure in his new position, evidenced by the events which transpired subsequent to Plaintiff's transfer to Naperville in January of 2019.

30. Prior to Plaintiff's transfer, Defendant's Chicago zone had experienced a severe

5

three year decline in sales for Buick and GMC.

31. Within a week of Plaintiff assuming his responsibilities as Zone Manager at Defendant's Naperville location, Defendant pulled out four (4) of Plaintiff's five (5) team members at that location. By dismantling Plaintiff's staff one by one, Defendant ensured Plaintiff had no resources available to succeed in his new role.

32. In stark contrast, Defendant did not remove the established team of Josh Weimer, the substantially younger employee in his early forties who replaced Plaintiff in Defendant's South Georgia zone.

33. Further hampering Plaintiff's ability to excel in his job upon transferring to the Chicago market, in January of 2019, Defendant's District Manager in Mid-Chicago was relocated to another zone. However, Defendant's replacement District Manager for Plaintiff's zone would not assume the role until March, leaving Plaintiff without a District Manager for over two months.

34. There was no interview or selection process to fill the Mid-Chicago District Manager position. Rather, Plaintiff was informed by his supervisor that Defendant's supervisor had selected a candidate whom he had a prior relationship with for the role. Plaintiff's Supervisor advised Plaintiff that Plaintiff had "no input" into selecting a Mid-Chicago District Manager, in contravention of his prescribed role as Zone Manager.

35. Nonetheless, Plaintiff persevered in his performance as Zone Manager in Defendant's Chicago zone and performed to Defendant's satisfaction.

36. As part of Plaintiff's relocation to Naperville, Illinois, Plaintiff was forced to sell his home in Georgia. In May of 2019, a buyer was set to close on the purchase of Plaintiff's Georgia home.

37. On May 24, 2019, subsequent to landing in Atlanta to complete his move to Chicago, Plaintiff was instructed to participate in a conference call with Steve Fahner, Plaintiff's Supervisor and Christine Clark, Defendant's Human Resources Business Partner.

38. During the May 24, 2019 phone call, Defendant's Human Resources Business Partner, Christine Clark, inquired whether Plaintiff had provided a particular candidate with interview questions in September of 2017. Plaintiff truthfully and unequivocally answered that he had done so.

39. To the dismay of Plaintiff, at the close of the May 24, 2019 phone call with Defendant's Human Resources Business Partner, Christine Clark, and Defendant's Supervisor, Steve Fahner, Plaintiff was advised that he was being suspended for providing potential interview questions to a candidate a year and a half earlier, in September of 2017.

40. Immediately following the 5:30 p.m. phone call on May 24, 2019, Plaintiff received a second phone call from Defendant's Human Resources Business Partner, Christine Clark. Plaintiff was unable to communicate adequately with Clark, Defendant's Human Resources Business Partner, as Clark's children were wailing and screaming in the background.

41. To Plaintiff's abject horror, it became increasingly apparent during a second phone call on May 24, 2019, with Defendant's Human Resources Business Partner, that Defendant was positioning for Plaintiff's termination, despite the pretextual reason for his suspension.

42. Four days later, on May 28, 2019, Defendant summarily terminated the employment of Plaintiff, who had never received any discipline in his career, because of his age, for pretextual reasons, despite his thirty-five (35) years of unblemished dedicated service to Defendant.

43. Defendant terminated Plaintiff's employment despite all indices that its reasoning to

justify Plaintiff's termination was inappropriate in light of Plaintiff's unblemished thirty-five (35) year career with Defendant.

44. The problematic facts which transpired prior to Plaintiff's September 2017 interview of the candidates to whom he had provided possible interview questions created the pretext to discriminate against Plaintiff based on his age, fifty-eight (58) years old, and is supported by the following:

- At the direction of his superiors, Plaintiff interviewed a series of outside candidates-whom Defendant had no intention of hiring- in addition to candidates who were internal to Defendant, for the South Georgia District Sales Manager opening;

- Upon receiving interview requests from Defendant's main office in Detroit, Plaintiff conversed with Defendant's Manager in Lexington, Kentucky, who indicated that Defendant had prescripted its candidate selection for the positions for which Plaintiff would conduct interviews.

- Defendant's Regional Manager, Dan Drews, expressed his interest in hiring Quentin S.[1], one of the internal candidates who had applied for the South Georgia District Sales Manager position;

- Prior to applying for Defendant's open position in South Georgia, Quentin S. had just completed Defendant's DMIT program;

- Upon Quentin S.'s successful completion of Defendant's DMIT program Dan Drews, Defendant's Regional Manager, articulated to Plaintiff that they "just

---

[1] Names have been withheld to protect the privacy of the referenced individual.

> needed to get an interview done" with Quentin S. and he would be "good to go" for the position;

- Prior to the interviews, Plaintiff reached out to two of the candidates favored by Defendant for the openings, providing advance notice of the interview and a list of potential interview questions common for Defendant;

- Plaintiff merely provided a few possible interview questions to Quentin S., not an exhaustive list of all of Defendant's interview questions;

- Plaintiff never provided Quentin S. with answers to the potential questions that could be asked during the interview for Defendant's open position in South Georgia;

- Quentin S., provided thorough, thoughtful answers to all the questions asked during his interview, which were not limited to the few possible questions provided to Quentin S. by Plaintiff; and

- What is sought through Defendant's interview questions are thoughtful answers, and those answers were not provided to Quentin S. by Plaintiff.

45. Plaintiff was aghast at Defendant's baseless proffered reason for his termination, as Defendant suffered no harm as a result of Plaintiff following industry practice and sharing potential interview questions with Quentin S.

46. Defendant's proffered reason for terminating Plaintiff's employment, more than a year and a half after the fact, is a real fabrication, given that Defendant's CEO, Mary Barra, provided the interview questions she asks Defendant's candidates to validate their integrity, in a public interview.

47. On April 9, 2018, Defendant's CEO, Mary Barra, again provided the most imperative interview questions that Barra asks candidates, regarding integrity, to *Quartz at Work*, which published those questions online.

48. On August 15, 2019, subsequent to Defendant's termination of Plaintiff's employment, Defendant's CEO, Mary Barra, was once again quoted by the online publication *Business Insider*, providing the same vital questions that she asks in every job interview.

49. As Defendant's CEO, Mary Barra, publicized the questions she asks candidates during interviews, the public has access to Defendant's interview questions on the most important issue- integrity.

50. It was common practice for Defendant to share potential interview questions with job candidates, evident by the conduct of Defendant's very own CEO, Mary Barra.

51. Indeed, Defendant's interview questions are posted on the internet and thus easily accessible to the general public. In fact, the "top General Motors interview questions" guide on the internet even provides answers to the aforementioned list of questions for the public.

52. Nonetheless, Plaintiff was summarily terminated, based on his age, for providing potential interview questions to an established, respected candidate who had already received a stamp of approval from Defendant's upper management.

53. As Plaintiff was successful despite Defendant's attempts to set Plaintiff up for failure, Defendant contrived the aforementioned pretextual reason to terminate Plaintiff's employment.

54. More evidence to support the pretextual nature of Defendant's proffered reasons for terminating Plaintiff, the incident over which Plaintiff was allegedly terminated-specifically,

providing possible interview questions to a candidate in advance of an interview-took place in September of 2017, over a year and a half prior to Plaintiff's termination.

55. In conjunction with the suspicious timing of Plaintiff's termination, are Plaintiff's refusal to accept the Defendant's proffered "Variable Separation Plan" and the transfer of Plaintiff across the country, where Defendant immediately removed Plaintiff's staff and resources.

56. Upon Plaintiff's termination by Defendant, Plaintiff was immediately replaced by a substantially younger employee who was at least ten (10) years younger than Plaintiff.

57. Further, in Plaintiff's thirty-five (35) year career, Plaintiff never received authorization to terminate an employee, even on issues of integrity, without the issuance of progressive discipline. Nevertheless, Defendant flouted its progressive discipline policy in regards to Plaintiff, resulting in Plaintiff's immediate termination, on the basis of his age, fifty-eight (58) years old.

58. In an effort to position against Plaintiff, subsequent to Plaintiff's termination, Defendant circumvented Plaintiff's medical retirement benefits and reduced his pension, towards which he diligently and loyally worked for over thirty-five (35) years.

59. To add more pressure on Plaintiff, following Plaintiff's unwarranted termination, Defendant continues to threaten him regarding repayment of Plaintiff's relocation costs from Georgia to Illinois.

60. Furthermore, while Plaintiff was terminated, for providing a few possible interview questions, Quentin S., the very employee who received those questions, is still employed by Defendant.

61. Notably, Quentin S., the employee who benefitted from the potential questions

11

Plaintiff provided, was such a viable employee, he was again promoted as recently as early 2019, indicating that providing Quentin S. possible interview questions was never a real issue for Defendant.

62. The discriminatory actions executed by Defendant in an effort to eradicate Plaintiff's employment after thirty-five (35) exemplary years, based on Plaintiff's age, fifty-eight (58), are as follows:

- Plaintiff, who is 58-years-old, was offered a Variable Separation Package in November of 2018, which was rejected by him;
- Defendant's Regional Manager, Dan Drews, vociferously insisted that Plaintiff accept the Variable Separation Plan offered by Defendant;
- Defendant offered the Variable Separation Plan to several thousand seasoned employees of Defendant, many of whom were eligible for retirement;
- Upon Plaintiff's refusal to accept the Variable Separation Plan offered in November of 2018, Plaintiff was threatened that he may be subject to involuntary termination without a severance package;
- During the sham interview of Plaintiff for the transfer to Chicago, Defendant's Supervisors did not ask a single interview question. Rather, Defendant's Supervisors merely inquired of Plaintiff, "are you sure you want to do this?"
- As evident by the only question asked of Plaintiff during his interview for the Chicago position, the purpose of the interview was merely to persuade Plaintiff into voluntarily terminating his employment with Defendant;

- Thereafter, Plaintiff was transferred from Atlanta to Chicago, and set up for failure in his role;

- Defendant took away all of Plaintiff's resources, including four of the five employees in Defendant's Chicago zone;

- Immediately upon his transfer to Chicago, Plaintiff was replaced in Atlanta by a substantially younger employee, who is in his early forties (40s); and

- On May 28, 2019, Plaintiff was terminated for providing potential interview questions to Defendant's preferred candidate for the South Georgia District Manager role in September of 2017, more than a year and a half after the interview took place;

- Defendant's CEO, Mary Barra, made Defendant's interview questions on the issue of integrity a matter of public record by disseminating the same to the media;

- When Plaintiff was terminated from his position in Chicago, Plaintiff was again replaced by a substantially younger employee who was ten (10) years younger than Plaintiff;

- The instance of Defendant's CEO, Mary Barra, sharing Defendant's interview questions was accepted as public relations banter. To the contrary, Plaintiff providing potential interview questions to a candidate was considered a terminable offense by Defendant, with no progressive discipline;

- As a consequence of Plaintiff's termination, Plaintiff suffered a significant, downward differentiation in his pension, lost retirement and medical benefits

he would have received upon retirement and suffered a loss of salary at an age when it is near impossible to procure alternate employment; and

- To add insult to injury and further embed the dagger, three days after Plaintiff's termination, he received a certificate from Defendant, signed by Defendant's CEO, identifying his thirty-five (35) years of loyal service to Defendant.

63. Based on the foregoing, Defendant was on a crusade to rid itself of Plaintiff because of his age, fifty-eight (58) years old.

64. Any reasons proffered by Defendant for the termination of Plaintiff's employment are merely pretext for discriminating against Plaintiff on the basis of his age, fifty-eight (58).

65. The aforementioned acts and omissions of Defendant constitute unlawful discrimination against Plaintiff on the basis of his age, fifty-eight (58) years old, in violation of the ADEA, as amended, 29 U.S.C. § 621 et seq.

66. As a direct and proximate result of the above alleged willful and reckless acts or omissions of Defendant, Plaintiff suffered damages, including but not limited to, lost and foregone wages and benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, STEVEN FRED WHITT, prays for judgment against Defendant and respectfully requests that this Honorable Court:

A. Declare the conduct of Defendant to be a violation of rights guaranteed to Plaintiff pursuant to appropriate federal law;

B. Grant permanent injunction restraining Defendant, its officers, successors, assigns,

and all persons in active concert or participation with them, form engaging in any employment practice that unlawfully discriminates on the basis of age;

C. Order Defendant to make whole STEVEN FRED WHITT, by providing the affirmative relief necessary to eradicate the effects of Defendant's unlawful practices;

D. Order Defendant to pay lost, foregone, and future wages to STEVEN FRED WHITT;

E. Grant Plaintiff the consequential, compensatory, liquidated and any other damages that the Court may deem appropriate;

F. Grant Plaintiff his attorneys' fees, costs, and disbursements; and

G. Grant Plaintiff such further relief as the Court deems necessary and proper in the public interest.

## JURY TRIAL DEMAND

67. Plaintiff requests a jury trial on all issues of fact and law raised by the allegations in this Complaint.

Respectfully Submitted,

STEVEN FRED WHITT, Plaintiff

By: s/Lisa Kane
Lisa Kane, Attorney for Plaintiff

Lisa Kane & Associates
Attorney for Plaintiff
141 West Jackson Boulevard, Suite 3620
Chicago, Illinois 60604
(312) 606-0383
Attorney Code No. 06203093
lisakane@sbcglobal.net

## VERIFICATION

I, STEVEN FRED WHITT, declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2019

_____
STEVEN FRED WHITT